We've decided that this is not a proper cross-appeal, and you should not have filed four briefs but only the normal three, and so we're going to confine you to an opening argument, a rebuttal argument and a reply. There won't be any sir rebuttal. But to be clear... Yes, you can raise the jurisdictional issue as a basis. The government can raise the jurisdictional issue as a basis for affirming the judgment below. So, Your Honor, will I still have rebuttal time? Oh yes, you have rebuttal time, but the government won't. Okay. Okay? Okay. You'll have five minutes of what you want to reserve, right? Yes, Your Honor. Okay. Okay. May it please the court. Good afternoon, Your Honors. I'm Danielle O'Byra, and I represent the appellant Mark Roberts. Mr. Roberts challenges the court of federal claims dismissal of his claim for living quarters allowance under 5 U.S.C. 5923. The statute at issue grants authority to the president to develop regulations to implement the act. The president delegated his authority to the Department of State, and the Department of State developed regulations which are contained in the DSSR, Department of Standardized Regulations. The DSSR sets forth the eligibility framework for determining if an employee is eligible. It includes the employee being recruited outside the United States and funds being available for the position. The Department of State further delegated its authority to heads of agencies to develop additional regulations, but in allowing heads of agencies to develop additional regulations to specifically state that it's subject to the provision of the DSSR regulations. Let me tell you what it seems to me your problem is. Under the Freifunovich case, it says that the statute in combination with the regulations was money mandated. It didn't say that the statute standing alone was money mandated. The regulations in Freifunovich were mandatory in terms of granting the living quarters allowance, whereas when you get down to the final regulation or order here, it creates discretion in the commander as to whether to give the living quarters allowance or not. So how do you deal with the fact that while a statute together with a mandatory regulation may be money mandating, this appears to be a situation in which the statute is not coupled with a mandatory regulation? The way we believe that what's wrong with this is that the final regulations that we're dealing with are inconsistent with the regulations contained in the DSSR. The DSSR, although they delegated authority to the heads of agencies, they specifically stated that the regulations must be consistent or they're subject to the provisions or regulations in the DSSR. So we do not believe the heads of agencies can deviate and fundamentally change the regulations that are already set forth in the DSSR. I don't believe, and we argue in our briefs, that the regulation developed by the Marine Corps, it imposes a new requirement. It gives itself tremendous authority that the DSSR does not give itself. It gives itself the authority to, as you said, make the statute completely discretionary, when if you look at the DSSR regulations, they don't make the statute completely discretionary. If he meets the eligibility framework under the DSSR, then he should be eligible. And pursuant to the statute, section 5922, it then mandates, it says, shall pay the employee. It was made clear to him when the position was offered that he wasn't going to get a living quarters allowance, wasn't it? Well, that's under dispute, your honor. If you look at the record that we submit, although the vacancy announcement says living quarters allowance is not going to be made available, in conversations that he had with other individuals, he believed he would be allowed LQA. And additionally, in the vacancy announcement itself, it did indicate that if you are already on a continuation agreement, you would be able to receive LQA. But he was definitely not on a continuation agreement. He was not. He may have mistakenly believed that he was at the time, but in his conversations with other individuals, he believed he would be eligible for LQA. But I think it's significant that that vacancy announcement contained that language because the government's argument is that they did not offer LQA due to funding. However, they were prepared to provide LQA in certain situations. And pursuant to our argument, Mr. Wofford... That's because the regulations required LQA in the continuing situation, correct? I'm not sure that that is the case. The way they received the offer, they made it clear in the offer, did it not, that he was not entitled to... He was told when he received the offer that there was no LQA. What you're arguing is in effect military mythology. That one former Marine says to another, hey, I got it. And so he thinks, well, I can get it too. And that's purely anecdotal. It's not mythology because the individual who initially told him was not another Marine, but it was a former base commander who... Who wasn't a Marine? I'm sorry, was not just another Marine who was telling his buddy that this is what happened. But the person who informed him was someone who had been in a position to grant LQA and who he believed was in a position to know whether it should be offered. Additionally, there were two affidavits offered in the lower court from individuals who testified that they were in some ways responsible at the other camp and they... What you're saying is I have a right to rely on people upon whom I have no right to rely. Well, no, our argument is that he has a right to rely upon the statute and the regulations and that the statute mandates payment once he meets the requirements of the regulations. So if we disagree with you on that, you're done. Well, if you disagree with us on that particular issue, we have a serious problem, obviously, because that is our argument, that the statute and the regulations provide him with mandates that he should receive LQA. And the regulations I refer to are not the military regulations, the Marine Corps regulations, but it's the regulations from the Department of State. The President designated the Department of State to implement regulations. But the Department of State regulations, as I think you recognized earlier, provide for further regulations down the chain. And the question is really, I think as you posed it, is whether the regulations, which on their face make this discretionary, are inconsistent with the DSSR. Could you address that? How are they inconsistent with the DSSR when the DSSR specifically provides for other regulations which may be more limiting? Well, the DSSR says that the additional... Where is the DSSR in the record here? The DSSR in the record, Your Honor, is at page A305. A305. And A307, I believe, are the regulations that we are concerned with today, which address quarters allowance. Well, the preamble, you don't even mention the preamble in your briefing, but the preamble to the DSSR refers to LQA being something that may be granted. Correct. And it does use the word may throughout. But despite the use of the word may, it also has laid out a framework for determining whether an employee is eligible. And that's found in the record at A307. And so in order for an employee to be eligible, they have to be recruited outside of the United States. And there's a test for that. And Mr. Roberts meets that test based on these regulations. And they have to be a United States citizen. And he meets that test also. So once he met this particular test, and if you read this in conjunction with A305, which specifically states that the delegation is subject to the provisions of these regulations and the availability of funds, and within the scope of these regulations, the head of an agency may issue such further implementing regulations as he or she may deem necessary for the guidance of their agency. And you think that language doesn't give them the authority to issue limiting regulations. And there's nothing in this language that says they can limit the regulations. It says that they must be consistent. But it's not mandatory. That is, the language of eligibility is not mandatory. The eligibility language... It's exclusionary. That is, it says if you don't meet this, you can't possibly qualify. But it's not mandatory that you get in. But if you go back to the statute itself, if you go back to 5923, it says that it may be paid when applicable. So we have to determine when is it applicable. Well, right. But I'll tell you what the problem is. The problem is the statute is not mandatory. The DSSR regulations are not mandatory. In our earlier case, the regulations down the chain were mandatory. But here they're not. So what's wrong with that analysis? Well, part of the problem with that analysis is that it also ignores section 5922 of the statute, which says, shall be paid under regulations prescribed by the President governing payments of the allowances and differentials and the respective rates at which the payments are made. As opposed to not under regulation, not mandating payment. Well, but as opposed to a situation where the individual does not meet the regulations. So if the individual was not eligible, then that would go to the merits of the case, as to whether or not they're eligible for payment. But, you know, and also just to discuss the jurisdictional issue, this too is what gives the lower court, the Court of Federal Claims jurisdiction because it becomes mandatory when they are required, when the individual meets the requirements of the statute, then the agency is required to make the payment. Sure. A statute, it seems that the cases are pretty clear that a statute can be money mandating, even if it's not money mandating in a particular... Precisely. And this court has held that in Doe and in other cases. But in this particular case, the... The problem is, I think, that we're having is mandating. And it's not that this isn't mandating. But I think in the lower court, in the Court of Federal Claims, in the Thomas case, the court correctly recognized that there is a problem when the regulation, when the DSSR and the regulations implemented by the agency, when they deviate to such an extent that the agency now has complete discretion to do whatever it wants. Because, essentially, if you say that the agency has complete discretion, then they can decide that they're going to give it to women, they're not going to give it to men. What that says is the agency can't say, we're going to give it to non-citizens residing in the United States. Well, but the agency can make, can decide, they could say that, that they're not going to give it to non... No, no, no. Could the agency say, we've decided we're going to give it to non-citizens living in the United States, we're going to give them a living portfolio. No, no. That's what it says. They could not say that. They could not do that. But if it's completely discretionary, as the government now argues, then the agency could, in fact, come up with any sort of criteria upon which to offer it. Even if we agree with you that they couldn't have unfettered discretion to set up criteria that were inconsistent with the purposes behind the statute, wasn't one of the purposes behind the statute for LQA was the need to be able to recruit good people to the location. And if an agency's regulations say, well, if good people are already at the location, then LQA doesn't serve that purpose. Well, the statute itself doesn't mention the word recruitment at all. It's not contained anywhere within the statute. What the statute does say, and what the congressional history also says, is that the statute was intended to ensure that any American citizen who is serving their country by working in a foreign country, that they are basically not penalized for doing so, that they have the funds that they need in order to serve their country. But the statute does not say anything about recruitment. That's something that was introduced, you know, outside of the statute. Okay. Thank you, Ms. O'Rourke. We've run out of time. Mr. Gilliam. Good afternoon, Your Honor. May it please the Court? Do you understand our point about the cross-appeal? I believe this means that when I'm done here, I'm done for all time. Well, it does mean that, but it also means in the future you shouldn't file cross-appeals when you're asking to sustain the judgment that existed below. Sure, and we certainly thought about that and thought the wiser choice, given the Court's precedence, was to ask permission for Solicitor General, and Solicitor General agreed out of abundance of caution we did. I assume, however, that the Court will entertain arguments concerning the Court's jurisdictional ruling. Yes. There's no problem with that. Yes. Thanks, Your Honor. I have to say this is probably the first time I sat in the front row in a law school, but it's a special honor to be sitting in front of the front row in a law school. Your Honor, it was error for the Court of Federal Claims to entertain this complaint because it lacked the money-mandating statute. Noting its reluctance to exercise jurisdiction, it nonetheless did, feeling it was constrained by a single sentence in this Court's case for Trifunovitch. There, this Court's predecessor, the Court of Federal Claims, was confronted with a situation where the parties agreed what was at issue was the merits, and they went right to the merits. The question was whether or not the particular person there was entitled under the regulations. Isn't it enough that a statute creating, I've got an ellipsis in this quote, a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery and damages? Yes. The Court has used terms like fair inference, reasonably amenable. I like to go back to sort of the old school requirement of Eastport. Eastport says you look for a command. There's no command in the statute whatsoever. We begin with the principle or the idea that the legislative history, certainly in authorizing agencies that beforehand could not pay these sorts of allowances, that the Congress not only wanted to establish a uniform system generally, but they also wanted to ensure that the government had the opportunity to facilitate recruiting the best qualified Americans for service. What's your response to the opposing counsel's statement that, well, there might be some legislative history to that effect, but it's not in the statute? Well, but there's also a very broad, whatever the purpose was, and again, we believe it was to ensure that the government was served by the best qualified people. When the statute actually got around to regulating, it provided only three criteria, and those certainly could not be criteria that ensured the government was served by the best qualified Americans. First of all, it said the person overseas had to be a citizen. Second of all, it said that that employee had to be paid according to a fixed pay scale or one that was based on pay scales in the United States. And third, of course, it had to be serving overseas, and it said very little else. However, it then went on to provide six broad areas of discretion, which the president was authorized to regulate. The first was, quote, the payment of allowances. I cannot imagine a broader delegation of authority than that. Second, it authorized the president to regulate concerning differentials and rates. Third, it allowed him to designate foreign areas. Fourth, groups of positions, a very broad term. Fifth, categories of employees to which the rates applied. And finally, the capstone, the sixth area of delegation, other related matters. Again, incredibly broad. This indicates that the Congress was not commanding anything with respect to pay. It was giving the president the authority to define who would be eligible. And as this court held in Adair in Houston, the power, Adair in particular, that's the voluntary incentive pay case, the power to define eligibility is the power to exclude. And so the power was given by the Congress. Let me give you a hypothetical, though, with respect to your jurisdictional argument. So what if somebody is actually clearly entitled under all the regs and the statutes to LQA and they just refuse to give it to them? Is your answer that there is no remedy? No. The Tucker Act, of course, grants jurisdiction to the Court of Federal Claims for money-mandating regulations as well as statutes and for regulations provided. Stop me right there. The hypothetical that Judge O'Malley asked you about has a money-mandating regulation, a mandatory regulation, which was the case in the Trayvonovitch case. No, I'm sorry. That wasn't my hypothetical. I'm sorry. Go ahead. My hypothetical is that there's lots of discretion in these regulations, but it just so happens that even under all those discretionary provisions, this person would have satisfied it. And so under your theory, they can't come to court and say, yes, I can see that there's some discretion in the regulations, but under every one of those discretionary provisions, I would qualify. Your answer would be that there would be zero remedy, right? This court would only have jurisdiction as a regulation that is money-mandating. There may be other remedies. For example, if the agency's action was discriminatory, certainly there would be remedies there. But from a jurisdictional standpoint under the Tucker Act, isn't it merely whether or not the statute and the regulations could conceivably result in a money-mandating obligation? And that, yes, there might be some discretion, but that doesn't mean it couldn't result in a money-mandating obligation. This court has said before this is not a neat line we're talking about. And this may be an example where I think the case is very strong that the statute is not money-mandating. If the statute were, if the Congress said to the President, and the President said to the Department of State, you may decide when these allowances would be paid, and the Department of State said all citizens overseas get paid. That's money-mandating. That would be the end of it. So what I'm saying is that the problem is that you are arguing from the jurisdictional standpoint that we should go all the way through the merits before we go back to see if there's jurisdiction. Doesn't it make more sense to say as long as the statute, when combined with regulations, could result in a money-mandating obligation that there's jurisdiction, but then your arguments as to discretion would go to the merits? I don't think we can go any lower than the regulations because the Tucker Act says money-mandating regulations provide a ground for jurisdiction. So if the regulation provided the ground, and then somehow some commander with authority decided to do whatever he had the authority to do, that might be a different case. But if the regulation... But if the regulation that you cite on page 32 of your brief, the one that was originally issued in Karvanovich, is that a money-mandating regulation? That regulation, that was a naval civilian... Was it a money-mandating? Was it or not? I don't know if it was a regulation. However, it did say that the Navy will pay as long as the civilian... So you're not answering my question. Is it a money-mandating regulation? You quote it on page 32. The naval instruction mandated payment. It was money-mandating. It said the Navy will pay... Was it money-mandating? Yes, it's money-mandating. Okay. I'm not sure it was a regulation. It was a civilian personnel... Well, you characterized it. You say a 1962 Navy regulation. A regulation. I'm not sure it was a notice-and-comment regulation, but nonetheless, the posture of Tarfunovich was that the Navy had exercised the discretion it had and agreed that it would pay as long as the Secretary of State said it would pay. So there was really no question there that it was going to come down to a question of merits, whether Mr. Tarfunovich, in fact, was simply on extended vacation or whether he was permanently in England. I'm sort of sitting here wrestling in my mind with whether if you were entitled to living quarter allowances and you didn't accept them, whether it would violate the Anti-Deficiency Act, because is that part of pay? It's allowances. Does it work backwards, where everybody's talking about the ADA right now and how much trouble you'll get in if you voluntarily do things? If those folks overseas, if they're continuing to live in those living quarters, isn't that money appropriated funds? Isn't it mandated to pay it once you say you're entitled to this amount? Isn't that mandated? I should probably defer to Major Congdon, who's come all the way from Japan and is a fiscal lawyer. I have practiced part-time as a fiscal lawyer in my Army Reserve career. I believe that allowances are paid out of appropriated funds, operational funds. These are passed annually by the Congress. Before any funds are expended, comptrollers at various levels ensure themselves that funding is available. If they were to provide housing, for example, that housing has costs and those costs would have to be found. If a service member is living on the economy and is qualifying for local quarters allowance, certainly that's going to have to be funded. As we know now, because we're in the shutdown, although you might expect that nobody should be working, including me, if I'm paid out of appropriation funds, there is arcane fiscal law that says, if I have to come to work and I do, I will be paid someday. I'm not so sure whether your concern is whether a decision by a rogue commander, for example, to grant quarters allowance where it was not permitted would be a spot that would put him in. As you know, nobody does anything in the military without regulations. As the court found here, these delegations tie in from the Congress to the Secretary of State, to the Department of Defense, to the Navy, to the Marine Corps orders. Everybody here is operating on some sort of mandate and very little discretion is exercised, at least until we reach the departmental level. Here, the department designated certain officers to make the call as to whether, in fact, the incentives were necessary, as General Kruse-Dosen did here, to decide whether she had the budget to do that. I'm running out of time, and I simply want to make a very broad point, and that is we acknowledge, of course, simply because the word may appears in a statute does not mean that the statute is not money mandating. Here, we have may not only in a statute, we have it in the regulations as well. However, it's incumbent on the plaintiff to demonstrate the court's jurisdiction. Of course, for this court, it is to decide as a matter of law. If you look inside the regulations, you will find no indicia that, in fact, a command was being levied. The fact that the delegations were very broad, for example, with respect to the statute, the Congress specified very few conditions, citizenship, location in a foreign country, being paid under a certain pay statute, but then delegated six forms of, I can count them up for you if you like, but I think I've mentioned them before, six areas in which the Secretary was asked to regulate broadly. And the President took all that power and sent it to the Secretary of State, and the Secretary of State then passed much of that power on. The Secretary of State in his regulations added very little. He added only two or three further qualifications that you had to be living in a foreign country. If the government found you there when it made you an offer of employment, it must find that you were there because you previously were there because you were hired by the government or some other specified employer. It must find that you had continuous employment with that employer and that you served under conditions where you could return to the United States. Only in those cases, and those are sort of the baseline provisions, however, even the Department of State regulations allow the government much more discretion, the agencies much more discretion beyond that, including the authority to decide when, basically when these things would be paid. For example, to find employees as those employees deemed eligible by the host agencies. So they were the host of, another one is, the authority to pass regulations concerning the granting of the payments. That's a very broad delegation. Provided the agencies may even waive the recruitment requirement if it served their purposes. It specifically defined employee as eligible as determined by relevant agency authority. And for us, one of the greatest indicia that this is not money mandating is the fact that the Department of State regulations even included the right to terminate altogether the allowances when, quote, the agency determined the termination to be equitable or in the public interest. Again, the power to define eligibility is the power to exclude. And here that power was clearly written. I was thinking of Justice Holmes when you were talking before. Pardon me? The power to tax. This is not completely original work, Your Honor. And in fact, I know she'll be listening shortly, but I'm also indebted to my colleague, Liz Whitmer, who is home in Colorado now, about to have a baby, actually. In short, on the question of whether the may, the presumption that may means that the government or that the agency have complete discretion, not only do these broad delegations further perfect that presumption, in short, we can say the following about the act itself and the regulations. First, the act and the regulations preclude allowances for certain groups, for example, non-citizens. They do nothing to require or to command that allowances be paid. They further delegate the granting, that's the word in the statute or in the regulation anyway, of allowances to the secretaries or to the agencies, and they do nothing from which Congress, from which we might infer the Congress or the Department of State intended to mandate or require anything. That's contrary to McBride and the Supreme Court's case Rogers, which stands for the proposition that even though the Congress may only use the word may, it may in fact intend to command the payment of a benefit. Here, there is no case along those lines. There are no clear standards set. What about the fact that 5922C uses the word shall? Yes, and that's the area that Thomas seizes on. Stephan, in the most recent case, seizes on. The shall, however, is that the president shall according to regulations. It doesn't say he shall pay. It's very similar to the regulations in Perry. Perry was the case involving the Asset Forfeiture Act, where the statute read that according to regulations written by the Attorney General. The Attorney General has discretion when to pay informant moieties. Whether the word was you will or the word was shall, the point was that the president was to write regulations and they were to concern the granting of, which is a very broad term, these benefits. Couldn't you just as easily read that shall be paid to be mandating in these circumstances where the regulations would otherwise authorize it and so it becomes money mandating, but the discretionary analysis is the part, just like the trial court did here, is what you ultimately look to on the merits to see if this person is entitled to it. Well, it's really the distinction between the merits, although they're very close, the merits and the jurisdiction. I think we have to look simply at the statute and where, as we've said, the word may is used and where there's so many broad delegations of authority to the president, including the authority to write regulations, and he has a secretary of state writing regulations that specifically say the service secretaries may write regulations concerning the granting of these benefits, then there's no doubt that the intent of the Congress and the intent of the State Department simply was not to require those payments. Clearly, they were focused on... Okay, Mr. Gellin, I think we're out of time. Thank you. Thank you, Your Honor. Sorry, we have two minutes. Your Honor, just a couple of things. First, as to the last discussion as to whether or not in this case the jurisdiction and the merits of the case merge, they do not. They're two separate and distinct determinations, and this court has found that repeatedly in Doe, in Fisher, and this case is similar to Doe. In that particular case, the court determined that once eligibility was determined, then the statute was money mandating, and therefore the court had jurisdiction, and we believe that that's the same case here in this case. Earlier, I believe there was a question about the legislative history and whether the legislative history in the statute is where the idea that this is a recruitment statute comes from, but if you look at the legislative history in the record at A530, there's nothing in the legislative history that even talks about recruitment either. It simply says that either a quarters allowance or free government quarters are furnished to each American citizen, civilian employee living in a foreign area by reason of disemployment by the United States government. This is not merely a recruitment statute that limits, that allows the Marine Corps to restrict the statute to recruitment needs. In addition, I just want to go back to the idea that 5922C, it does say shall pay, which mandates, which in our opinion requires the government to pay, and once that requirement, once they are required to pay, then the statute is money mandating, and it goes beyond just being money authorizing. Thank you very much, Ms. Miller.